UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRIDE INDUSTRIES, INC., | No. 2:19-cv-01620 KJM CKD |
| Plaintiff, | |
| v. | ORDER |
| COMMITTEE FOR PURCHASE FROM PEOPLE WHO ARE BLIND OR SEVERELY DISABLED, et al., | |
| Defendants. | |

On August 26, 2019, plaintiff PRIDE Industries, Inc. ("PRIDE") moved to preliminarily enjoin the U.S. AbilityOne Commission ("AbilityOne" or "defendants") from taking any further action under a Pilot Program to award a contract for services at United States Army Base Fort Bliss ("Fort Bliss"). Compl., ECF No. 6-1. Plaintiff alleges the Pilot Program conflicts with the statutorily prescribed system for contract selection under the Javits-Wagner O'Day Act, 41 U.S.C. §§ 8501–8506 ("JWOD Act"). Compl. at 1. Defendants oppose the motion, Opp'n, ECF No. 32, and plaintiff has replied, Reply, ECF No. 36. The court heard oral argument on the motion on October 24, 2019. After thorough consideration of the arguments and the governing law, the court DENIES plaintiff's motion for preliminary injunction. The court's reasons for its decision are below.

## I. STATUTORY AND REGULATORY FRAMEWORK

Because an understanding of the statutory and regulatory framework undergirding the complaint is essential to comprehending plaintiff's claims and the court's resolution of the pending motion, the court begins with a review of that framework here.

### A. Javits-Wagner-O'Day Act (JWOD)

In 1971, Congress enacted the Javits-Wagner-O'Day Act, 41 U.S.C. §§ 8501–8506 ("JWOD Act"), an update to the Wagner O'Day Act of 1938. The JWOD Act created the Committee for Purchase From People Who Are Blind or Severely Disabled (the "AbilityOne Commission" or the "Committee") to administer the AbilityOne program, which aims to "increase employment and training opportunities for persons who are blind or have other severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other severe disabilities." 41 C.F.R. § 51-1.1.

The JWOD Act established a unique procurement process for the government projects designed to train and employ people who are blind or severely disabled. Under this process, AbilityOne maintains a procurement list of products and services suitable for federal government procurement from qualified nonprofit agencies (NPAs) employing the blind or severely disabled. 41 U.S.C. § 8503(a)(1). Qualified NPAs must employ "blind or other severely disabled individuals for at least 75 percent of the hours of direct labor required for the production or provision of the products or services." 41 U.S.C. § 8501(6)-(7). The Federal Government may purchase products and services from the procurement list at a Committee-determined Fair Market Price (FMP), and the Committee "from time to time shall revise its price determinations with respect to those products and services in accordance with changing market conditions." 41 U.S.C. § 8503(b).

AbilityOne manages the JWOD program with the help of central nonprofit agencies (CNAs), which "facilitate the distribution, by direct allocation, subcontract, or any means of orders of the Federal Government for products and services on the procurement list among qualified [NPAs] for the blind or qualified nonprofit agencies for other severely disabled." 41 U.S.C. § 8503(c). National Industries for the Blind is the CNA that represents NPAs

employing people who are blind; SourceAmerica is the CNA that represents NPAs employing people with severe disabilities, including PRIDE, the plaintiff here. 41 U.S.C. § 8503(c); 41 C.F.R. § 51-3.1.

AbilityOne "determine[s] the fair market price of products and services contained on the procurement list" through a process that involves the contracting activity, the NPA and the CNA. 41 U.S.C. § 8503(b). The "contracting activity" is "any element of an entity of the Government that has responsibility for identifying and/or procuring Government requirements for commodities or services." 41 C.F.R. § 51-1.3. The Committee sets the initial price through "negotiations between the contracting activity and the [NPA] which will produce or provide the commodity or service to the Government, assisted by the [CNA]." 41 C.F.R. § 51-2.7(a). The Committee may revise prices in the face of changing market conditions, "which include negotiations between contracting activities and producing [NPAs], assisted by [CNAs], or the use of economic indices, changes in nonprofit agency costs, or other methodologies permitted under these procedures." 41 C.F.R. § 51-2.7(b). Contracting activities and NPAs will submit recommendations for the fair market price to the CNA. 41 C.F.R. § 51-2.7(c). Then, the CNA will submit the recommended price and reasoning behind it to the Committee. 41 C.F.R. § 51-2.7(c).

The contracting process described above differs from the typical federal contracting process based on the unique needs of the blind and severely disabled. "It is the policy of the Government to increase employment and training opportunities for persons who are blind or have other severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other severe disabilities." 41 C.F.R. § 51-1.1. Because AbilityOne is subject to a statute that "expressly authorizes or requires that the procurement be made through another executive agency or from a specified source," Congress has allowed AbilityOne to use noncompetitive procedures to further this policy. 41 U.S.C. § 3304(a)(5) ("An executive agency may use procedures other than competitive procedures only when—[. . .] a statute expressly authorizes or requires that the procurement be made through another executive agency or from a specified source"). As a result, AbilityOne and the qualified

3

nonprofit agencies for the blind or severely disabled need not provide for "full and open competition." Federal Acquisition Regulation (F.A.R.) subpart 6.302-5(b)(2) ("This authority may be used when statutes, such as the following, expressly authorize or require that acquisition be made from a specified source or through another agency: [. . .] (2) Qualified nonprofit agencies for the blind or other severely disabled 41 U.S.C. chapter 85, Committee for Purchase From People Who Are Blind or Severely Disabled (see subpart 8.7)).

### B. National Defense Authorization Act (NDAA)

On December 23, 2016, Congress passed the National Defense Authorization Act of 2017 (NDAA). National Defense Authorization Act of 2017, Pub. L. No. 114-328, § 898, 130 Stat. 2331 (2016). Section 898 of the NDAA empowered the Secretary of Defense to establish a Panel on Department of Defense and AbilityOne Contracting Oversight, Accountability, and Integrity (referred to as the "Section 898 Panel"). National Defense Authorization Act § 898(a)(1). The NDAA provided that the Section 898 Panel shall "recommend ways the Department of Defense and AbilityOne Commission may explore opportunities for competition among qualified nonprofit agencies or central nonprofit agencies and ensure equitable selection and allocation of work to qualified nonprofit agencies." *Id.* § 898(c)(6). The Section 898 Panel is required to submit an annual report to Congress about these opportunities. *Id.* § 898(i)(2).

The annual report is required to contain a summary of findings and recommendations to the Secretary of Defense, the Chairman of the AbilityOne Commission, Congressional defense committees, the House Committee on Oversight and Government Reform and the Senate Committee on Homeland Security and Governmental Affairs. *Id.* For example, the report shall include "recommendations for any changes to the acquisition and contracting practices of the Department of Defense and the AbilityOne Commission to improve the delivery of goods and services to the Department of Defense." *Id.* § 898(i)(2)(D). Additionally, the report shall consider the provisions of the JWOD Act and include "recommendations for administrative safeguards to ensure the Department of Defense and the AbilityOne Commission are in compliance with the requirements of the Javits-Wagner-O'Day Act, Federal civil rights law, and regulations and policy related to the performance of contracts of the Department of Defense with

qualified nonprofit agencies and contracts of the AbilityOne Commission with central nonprofit agencies." *Id.* § 898(i)(2)(E). The report also is to include an examination of the current structure of AbilityOne "to eliminate waste, fraud, and abuse and to ensure contracting integrity and accountability for any violations of law or regulations." *Id.* § 898(i)(2)(C).

The NDAA grants powers to the Section 898 Panel to implement its recommendations by setting milestone dates and allowing the Section 898 Panel to notify the Department of Defense and certain Congressional committees if and when AbilityOne has not complied. National Defense Authorization Act § 898(f)(1)–(2). If AbilityOne does not implement the recommendations and the Secretary of Defense receives notice under subsection (f)(2), "the Secretary may suspend compliance with the requirement to procure a product or service in section 8504 of title 41, United States Code, until the date on which the Secretary notifies Congress, in writing, that the AbilityOne Commission is substantially implementing the recommendations made under subsection (c)." *Id.* § 898(g)(1)(A).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff PRIDE is a 501(c)(3) nonprofit social enterprise corporation. PRIDE employs, trains and rehabilitates persons who have significant disabilities. Compl. at 6. AbilityOne awarded PRIDE a contract to provide Facility Support Operation Services at Fort Bliss in 2006. Shelly Hammond Decl. ¶ 2, ECF No. 22-1. Currently, the contract has an overall value of $368,270,753.28 and PRIDE employs 318 persons with disabilities at Fort Bliss. Compl. ¶ 4. The Army has renewed the original, five-year contract twice and PRIDE's current contract expires on January 31, 2020. Opp'n at 6.

In early 2019, PRIDE alleges the Army issued a show cause notice to PRIDE and took exception to PRIDE's performance of the Fort Bliss contract. Compl. ¶ 24. PRIDE also alleges the Army began making statements about acquiring the Fort Bliss contract at a price lower than the price it paid PRIDE. *Id.* ¶ 25. In Spring 2019, the Army advised PRIDE it would extend the Fort Bliss contract until January 2020, after which point the contract would be performed by the party awarded the contract by AbilityOne through a new, pilot procurement process. *Id.* ¶ 27.
/////

During hearing on its motion for preliminary injunction, plaintiff pointed to portions of the record showing the Army had already begun discussing cost and price even before the Section 898 Panel issued its recommendations. At a meeting on November 9, 2017, for example, AbilityOne staff and Army staff discussed how "relief on price" was a "major concern for the Army." Administrative Record (AR) 128–130; ECF No. 33-3. AbilityOne staff acknowledged these concerns and mentioned the Commission's current procedures governing price changes and assistance with price. *Id.* At another meeting with AbilityOne representatives on April 5, 2018, Army staff discussed the separate Fort Polk contract and the failure of the NPA there, which also happens to be plaintiff, "to negotiate a recommended fair market price with the Army." AR 124; ECF No. 33-3. Regarding other similar contracts at multiple Army bases, one Army official stated the Army "also [was] considering pulling all AbilityOne installation management contracts to award through other contracting mechanisms as it would allow the DoD to realize a $200 million savings." AR 124; ECF No. 33-3. Army representatives repeatedly underscored the possibility of saving $200 million through changing procedures across all AbilityOne contracts, throughout the rest of the meeting. AR 126; ECF No. 33-3. Administrative Memoranda between AbilityOne and the Army reflect the Army's concern about price and cost. AR 8–10, 14–17; ECF No. 33-3.

On July 18, 2018, the Section 898 Panel submitted its first annual report to Congress on ways to explore competition among NPAs. Opp'n at 6 (citing Annual Report (AR) 56-118).[1] The report stated: "CNA and NPA perception that a designated NPA remains the provider of a product or service in perpetuity can erode performance, escalate prices, and impact customer satisfaction, and the AbilityOne program reputation and employment." Opp'n at 6–7 (citing AR 56-118). As a result, the Section 898 Panel recommended the Commission "require CNAs to use a specific list of measurable qualifications when choosing an NPA for project assignment, such as price, technical capability for the work, past performance, and the percentage

---

[1] A complete copy of the 2018 Annual Report is available at https://www.acq.osd.mil/dpap/cpic/cp/docs/First_Annual_RTC_on_the_Panel_on_DoD_and_AbilityOne_Signed_18_July_18.pdf (last viewed October 25, 2019). At the time of the hearing on the plaintiff's preliminary injunction motion, the 2019 Annual Report had not been issued.

of disabled hours." Opp'n at 6 (citing AR 56-118). The report also recommended the AbilityOne Commission implement pilot programs that could require "a best value trade-off similar to other Federal source selection procedures." Opp'n at 7 (citing AR 56–118).

The Executive Director of AbilityOne then told the Commission staff to implement a competition pilot. Opp'n at 7 (citing AR 5–7). On August 25, 2018, AbilityOne, SourceAmerica and the U.S. Army Mission and Installation Command discussed the contract at Fort Bliss. Hammond Decl. ¶ 3. In November 2018, AbilityOne started to work on developing the pilot with the Army. On April 24, 2019, AbilityOne, the U.S. Army Installation Management Command and the U.S. Army Mission and Installation Contracting Command signed a Memorandum of Agreement agreeing to a pilot program for use in selecting an NPA to provide Facility Support Operations Services at Fort Bliss. Opp'n at 7.

On June 10 and 11, 2019, AbilityOne announced the Pilot Program, which incorporated two new policies governing the procurement process. On June 10, AbilityOne introduced the first policy, Interim Policy 51.301.1, which announced "a competitive nonprofit agency (NPA) recommendation process will be conducted, considering technical capability, past performance, and price." Compl., Ex. A at 1. The policy identifies an appeals process: NPAs should send appeals to the Commission 10 days "after an NPA's debriefing or notice of the Commission's debriefing or notice of the Committee's decision." *Id.*, Ex. A at 6(e). On June 11, 2019, AbilityOne introduced the second policy, Interim Policy 51.620.1, which provides that a CNA, such as SourceAmerica, "to avoid the actual or appearance of a conflict of interest, shall not provide technical and/or pricing assistance to any NPA participating in the pilot test." *Id.*, Ex. B at 5(b)(ii). A CNA must maintain "confidentiality" in all areas, but may provide "technical assistance and advice to the integrated government team in the evaluation of the Recommended-FMP." *Id.* As part of the new Pilot Program, NPAs must "provide their pricing information in accordance with the instructions included in the Opportunity Notice." *Id.* Finally, the policy asserts the Commission "oversees the pilot test in accordance with 41 U.S.C. § 8503," which is the JWOD Act. *Id.*, Ex. B at 5(a)(i).

/////

On July 31, 2019, SourceAmerica, the qualified CNA for the Fort Bliss Contract, published Posting #3706, for Facility Support Operation Services at Fort Bliss. Compl. ¶ 29, Ex. B. The posting described the process for selecting the NPA, which "will include price competition among qualified participating nonprofit agencies of the AbilityOne program" and require those applying to submit both a Price Response and a Technical Response. *Id*. In a letter dated August 21, 2019, AbilityOne informed the NPAs, including PRIDE, "Commission staff and the Army will jointly evaluate the NPA price proposals against the Independent Government Cost Estimate prior to the Commission members establishing the fair market price." Compl. ¶ 31 (citing Letter from T. Robinson to M. Ziegler dated Aug. 21, 2019 at 2). On August 21, 2019, plaintiff filed suit in this court seeking declaratory and injunctive relief on grounds that (1) the AbilityOne Commission violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 and the JWOD Act, 41 U.S.C. §§ 8501–8506, "in failing to enforce its statutory mandate underlying the AbilityOne program, including in failing to protect PRIDE's Fort Bliss Contract and through issuing the Posting," and (2) PRIDE's Fort Bliss Contract was improperly terminated and issuing the Posting violated AbilityOne's statutory mandate under 41 U.S.C. § 8503. Compl. at 19-20. Plaintiff asserts, without opposition, that 28 U.S.C. § 1331 predicates the court's jurisdiction over this case because it is a civil action arising under the laws of the United States, namely the APA, 5 U.S.C. §§ 701–706. Compl. at 5.

On August 26, 2019, plaintiff filed a motion for preliminary injunction motion seeking to (1) enjoin AbilityOne from issuing "the Solicitation or otherwise taking steps to compete contracts for products or services on the Procurement List," and (2) enjoin AbilityOne "from violating JWOD and abandoning the tenets of ratio as well as Program-defined Fair Market Price in favor of 'lowest bidder' procurements that will ultimately and impermissibly sound the death-knell of the AbilityOne Program." Mem. at 19, ECF No. 3.[2]

---

[2] At argument on the preliminary injunction motion, plaintiff referenced the Tucker Act, 28 U.S.C. § 1491b(1), which states district courts "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement [. . .] without regard to whether suit is instituted before or after the contract is awarded." Plaintiff raised the

8

Before the court heard the preliminary injunction motion, on September 27, 2019, plaintiff filed a motion for a temporary restraining order after receiving a revised timeline for the Fort Bliss procurement, which provided AbilityOne would release the procurement award decision on October 4, 2019. Mem. at 2, ECF No. 17. Defendants responded and provided a status report showing the revised timeline with an October 4th decision date was a mistake. Status Report Hammond Decl., ECF No. 24. The court heard arguments at a motion hearing on October 4, 2019 and DENIED the motion for a temporary restraining order from the bench, without prejudice to full consideration of the motion for preliminary injunction.

III. LEGAL STANDARD

Injunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the moving party is entitled to this relief. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). As provided by Federal Rule of Civil Procedure 65, a court may issue a preliminary injunction to preserve the relative position of the parties pending a trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The party seeking injunctive relief must show it "is likely to succeed on the merits, . . . is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

Before the *Winter* decision, the Ninth Circuit employed a "sliding scale" or "serious questions" test, which allowed a court to balance the elements of the test "so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)). The Circuit has found that its "serious question" sliding scale test survived *Winter*. A court may issue a preliminary injunction when the moving party raises serious questions going to the merits and shows the balance of hardships tips sharply in its favor, so long as the court also considers the remaining two prongs of the *Winter*

---

Tucker Act in connection with bid protest procedures before the General Accounting Office (GAO), and has not relied on the Tucker Act in its complaint or any of its briefing. The court does not address the substance of any argument based on the Tucker Act here. *See* Compl. 16-20.

test. *Cottrell*, 632 F.3d at 1134–35. Yet a court need not reach the other prongs if the moving party cannot demonstrate a "fair chance of success on the merits" to begin with. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (quoting *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2008)) (internal quotations omitted).

IV. DISCUSSION

Plaintiff premises its motion for preliminary injunction on both claims raised in the complaint: (1) the AbilityOne Commission violated the APA, 5 U.S.C. §§ 701–706, and the JWOD Act, 41 U.S.C. §§ 8501–8506, and (2) PRIDE's Fort Bliss Contract was improperly terminated and issuing the Posting violated AbilityOne's statutory mandate of 41 U.S.C. § 8503.[3] *See generally* Compl. For the reasons below, the court DENIES the motion.

A. Article III Standing

As a threshold matter, the court addresses defendants' contention the court lacks standing to hear this matter. Opp'n at 11. For plaintiff to have Article III standing, its claim must satisfy three elements: "(1) an injury in fact that (2) is fairly traceable to the challenged conduct and (3) has some likelihood of redressability." *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 908 (9th Cir. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Here, defendants focus their challenge on the first element, injury in fact. Defendants claim plaintiff "has not shown that it has suffered an injury in fact" because plaintiff is still performing the contract at Fort Bliss and can only say that AbilityOne might not select it to perform the services after the current contract expires on February 1, 2020. Opp'n at 11. Plaintiff identifies three separate injuries in response to defendants' challenge. Reply at 3–5. First, plaintiff states it has suffered injury because the Pilot Program "makes PRIDE's reauthorization dependent on its ability to engage in price competition, which is [] contrary to law." Reply at 3. Second, plaintiff argues it has suffered injury because the Pilot Program has "deprived PRIDE of its chief advocate in navigating the AbilityOne program," Source America, which has prejudiced PRIDE. Reply at

---

[3] At hearing, the court asked whether plaintiff still argues the Fort Bliss Contract was improperly terminated. Plaintiff's counsel clarified the Fort Bliss Contract has not been terminated and plaintiff no longer argues this point.

10

3–4.  Finally, plaintiff claims the Pilot Program has injured it because it has led to an added financial cost, because "PRIDE has incurred approximately $350,000 as part of its efforts to secure the competitively bid contract."  Reply at 4.  Additionally, PRIDE has "been forced to change the scope of its contracting model."  *Id.*

The court finds plaintiff has met the constitutional requirements for standing.  First, at a minimum, PRIDE has spent $350,000 more than it would have otherwise in its efforts to secure the Fort Bliss contract under the new price competition process.  Reply Dern Decl. ¶ 8, ECF No. 36.  Second, as plaintiff argued at hearing, a party can suffer harm when agency action, as here, introduces competition where it previously did not exist.  *See Hardin v. Kentucky Util.*, 390 U.S. 1, 6, 7 (1968) (finding harm when Kentucky Utilities faced competition and "particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest") (citations omitted); *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 950 (finding harm when U.S. D.O.T. lifted "regulatory restrictions" on plaintiffs' competitors or "otherwise allow[ed] increased competition against them.") (citations omitted).  Third, as a result of defendants' revision of contract bidding terms and PRIDE's modifications to address them, PRIDE employees with severe disabilities already have faced major changes in their training programs and employee support.  Reply at 10; Dern Decl. ¶ 11 (President of PRIDE outlining changes to employee programs and support); R. Gutierrez Decl. (disabled veteran PRIDE employee describing his existing work and support from PRIDE), ECF No. 36; W. Green Decl. (disabled veteran PRIDE employee outlining his work and PRIDE's investment in its employees), ECF No. 36.  Fourth, the Pilot Program is causing PRIDE to reconsider its significant annual investment in employee training and retention because under the new bidding criteria PRIDE will not be able "to maintain the same level of support services to its employees."  Dern. Decl. ¶ 12.  The court finds each of these injuries as alleged is traceable to the Pilot Program.  Moreover, the injury has some likelihood of redressability in the event plaintiff prevails in this action.

/////

/////

/////

11

B. <u>Administrative Procedure Act Requirements</u>

The court turns to defendants' argument plaintiff has not met the requirements for judicial review of agency action under the Administrative Procedure Act (APA). Defendants argue plaintiff is not challenging a final agency action, pointing to portions of plaintiff's complaint identifying actions AbilityOne has taken in the course of implementing the Pilot Program, which has not yet concluded. Opp'n at 11–12. In reply, plaintiff asserts initiation of the Pilot Program itself qualified as final agency action that is "neither interim nor tentative, but stands as the Commission's definitive policy regarding how it will allocate the Fort Bliss contract." Reply at 2. Plaintiff also argues the Pilot Program "places new obligations on NPAs interested in the Fort Bliss contract and substantively changes the legal regime by which the Commission will allocate the relevant requirements in a manner inconsistent with controlling law." *Id.*

The APA provides for judicial review of agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, limitations or short of statutory right," 5 U.S.C. § 706(2)(C). Courts may only review agency action when it is final, which means "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154 (1997). Courts take a "pragmatic" approach to decide whether agency action is final. *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 150 (1967)) (holding Interstate Commerce Commission order regarding commodity exemption from regulation reviewable even though order "had no authority except to give notice of how the Commission interpreted" statute and "would have effect only if and when a particular action was brought against a particular carrier")).

Having carefully considered the matter in light of the facts and the law, the court cannot find defendants' implementation of the Pilot Program to date qualifies as final agency

action; thus, plaintiff does not satisfy the requirements for judicial review of the Pilot Program under the APA.  Plaintiff has not identified and the court has not located any case law finding a Pilot Program or anything equivalent constitutes final agency action prior to the culminating decision anticipated by the Program, here a bid award.  Courts in certain cases have found final agency action in situations somewhat analogous to those surrounding the Pilot Program here.  *See Planned Parenthood of New York City v. U.S. Dep't of Health and Human Services*, 337 F.Supp.3d 308, 326 (S.D.N.Y. 2018) (updated Funding Opportunity Announcement that prevented plaintiff from applying for government funds constituted final agency action); *State ex rel. Becerra v. Sessions*, 284 F.Supp.3d 1015, 1031–32 (N.D. Cal. 2018) (finding federal grant conditions requiring compliance with federal requirements about communications between state and federal government about immigration constituted final agency action).  Despite some similarities, however, there are crucial differences between the agency action in *Planned Parenthood*, *Becerra* and the Pilot Program in this case.  Unlike the conditions imposed on applying for the grant in *Planned Parenthood* or receiving the grant money in *Becerra*, nothing about the Pilot Program here has precluded PRIDE's applying for the Fort Bliss contract in the first instance.  As PRIDE conceded at hearing, it is still possible that PRIDE will receive the contract once AbilityOne makes its decision, now due on October 31, 2019.  Without a final decision awarding the contract, the defendants' actions to date are not actions from "legal consequences will flow."  While plaintiff points to the changes to the application process made through the Pilot Program, and the resulting changes PRIDE has had to undertake to its contracting model, Reply Dern Decl. (Ex. B) ¶ 8, ECF No. 36, plaintiff has not demonstrated these changes constitute a final agency action.  The court finds plaintiff has not met the APA requirements for judicial review for purposes of obtaining a preliminary injunction.

### C. Preliminary Injunction Test Applied

Plaintiff has not satisfied the elements required to obtain a preliminary injunction, as explained below.  *See Timbisha Shoshone Tribe v. Salazar*, 697 F.Supp.2d 1181, 1187 (E.D. Cal. 2010) (finding no "final agency action" and no likelihood of success on the merits in an injunctive relief action against the Bureau of Indian Affairs).

"[L]ikelihood of success on the merits is 'the most important' factor; if a movant fails to meet this 'threshold inquiry,' [a court] need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (citing *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 869 (9th Cir. 2017)). The "relevant inquiry" of whether plaintiffs have shown a likelihood of success on the merits is "whether they are likely to prevail on the causes of action they assert in their complaint." *Timbisha Shoshone Tribe*, 697 F.Supp.2d at 1187. Unless or until plaintiff identifies final agency action that is subject to the court's review under the APA, plaintiff is unable to demonstrate any potential for success on the merits, let alone a likelihood of success. Relatedly, plaintiff has not demonstrated it is "likely to suffer irreparable harm in the absence of preliminary relief," because it concedes it may still prevail in securing the Fort Bliss contract award in the near future; if plaintiff does prevail, it has not shown it will have suffered irreparable harm even if it incurred greater costs in submitting a bid application. Given that neither of the first two Winter factors weighs in plaintiff's favor, plaintiff cannot satisfy the last two, "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

While in the court's mind plaintiff has raised serious questions regarding whether the Pilot Program is fully compliant with the JWOD Act,[4] doing so at this juncture, pre-award,

---

[4] For example, plaintiff argues persuasively the JWOD Act creates a uniquely tailored statutory scheme for providing government services contracts to the blind or severely disabled. While defendants are correct that no language expressly prohibits the Commission from "taking into consideration how much a nonprofit agency proposes to charge the government," Opp'n at 13, they appear to oversimplify and ignore the statutory scheme Congress designed to distance price from the decision process to encourage government hiring of blind and severely disabled people. *See* 41 U.S.C. § 3304(a)(5); F.A.R. subpart 6.302-5(b)(2). Consistent with this scheme, once a contract is awarded, JWOD Act regulations allow price revisions "in accordance with changing market conditions under Committee procedures, which include negotiations between contracting activities and producing nonprofit agencies, assisted by central nonprofit agencies." 41 C.F.R. § 51-2.7(b). The Pilot Program may bypass this provision for price revisions. Additionally, defendants appear to rely on too broad an assertion of authority based on the NDAA, which directs defendants to find means of reforming AbilityOne's contracting processes. While plaintiff does not properly acknowledge the reforms that may well occur as a result of the NDAA, that public law does not appear to confer blanket authority to completely reform contracting processes covered by the JWOD Act. Even though the NDAA provides for the possibility of pilot programs, the use of a so-called pilot program to award actual contracts may go too far. Plaintiff has at least raised serious questions regarding AbilityOne's compliance with the JWOD Act and

14

does not satisfy the alternative "serious question" sliding scale test available in the Ninth Circuit in light of *Alliance for the Wild Rockies,* 632 F.3d at 1131. The serious questions plaintiff has raised do not increase its likelihood of success on the merits given the requirement of final agency action under the APA, and therefore do not alter the preliminary injunction analysis.

V. CONCLUSION

Plaintiff has not met the burden of demonstrating the Pilot Program itself is a final agency action, meaning plaintiff has not met APA requirements for judicial review, and cannot meet the requirements for obtaining a preliminary injunction at this stage of the case, prior to award of the Fort Bliss Contract. Plaintiff PRIDE Industries, Inc.'s Motion for Preliminary Injunction is DENIED.

DATED: October 29, 2019.

_____
UNITED STATES DISTRICT JUDGE

---

accompanying regulations by imposing here the Pilot Program for the Fort Bliss contract that, despite defendants' representations to the contrary, appears to significantly modify if not abandon statutorily prescribed pricing and allocation processes.

15